**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| GINA L. BRADFORD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 13-CV-447-JHP-PJC |
| | ) | |
| TMA SYSTEMS, L.L.C., | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

Now before the Court is the Motion for Summary Judgment and Supporting Brief filed by Defendant, TMA Systems, LLC ("TMA") [Doc. No. 27]. Plaintiff, Gina L. Bradford ("Bradford"), filed a Response Brief in Opposition to Defendant's Motion for Summary Judgment [Doc. No. 36], and TMA filed a Reply to Bradford's Response [Doc. No. 42]. Bradford filed her Complaint against TMA on July 23, 2013 [Doc. No. 2], alleging sexual harassment and hostile work environment in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et. seq.* ("Title VII"). Bradford contends that during her employment she was subjected to sexually inappropriate comments, unwanted shoulder rubs and hugs, and loud angry outbursts. Bradford claims that the alleged sexual harassment resulted in her constructive discharge. TMA moves for summary judgment on various grounds, including: (i) Bradford failed to file her EEOC Charge of Discrimination within 300 days; (ii) Bradford cannot establish that the alleged conduct was directed at her because of her gender; (iii) Bradford cannot meet the burden required for constructive discharge where there were alternatives known and available to her other than resignation; (iv) Bradford cannot establish that her working conditions were "intolerable," as required for constructive discharge; (v) the *Faragher/Ellerth*

affirmative defense entitles TMA to summary judgment; and (vi) Bradford cannot establish that she was subjected to severe or pervasive sexual harassment.

Having fully considered the briefs filed by the parties, and the testimony and evidence submitted therewith, the Court hereby **grants** TMA's Motion for Summary Judgment for the reasons set forth below:

## I. <u>BACKGROUND</u>

TMA is a provider of facilities maintenance software for businesses and government entities worldwide. (Doc. No. 27, p. 2, ¶1; Doc. No. 36, p. 2, ¶1). Bradford became employed by TMA as its Chief Information Officer ("CIO") in January 2010 and was promoted to Chief Operating Officer ("COO") in January 2012. (Doc. No. 27, p. 3, ¶3; Doc. No. 36, p. 2, ¶3). Bradford earned approximately $250,000 per year in salary and bonuses, and she was the highest paid employee aside from TMA's Chairman and Chief Executive Officer ("CEO"), John C. Smith ("Smith"). (Doc. No. 27, p. 3, ¶4; Doc. No. 36, p. 2, ¶4). Bradford was responsible for managing approximately fifty (50) employees and supervising at least five to seven internal departments. (Doc. No. 27, p. 3, ¶5; Doc. No. 36, p. 2, ¶5). Bradford was never demoted, reassigned or disciplined during her employment, nor did she ever receive a decrease in pay. (Doc. No. 27, p. 3, ¶6; Doc. No. 36, p. 2, ¶6). Bradford testified that at all times during her employment, she performed her job duties at a more than satisfactory level. (Doc. No. 27, p. 3, ¶7; Doc. No. 36, p. 2, ¶7). Prior to her employment with TMA, Plaintiff had nearly twenty (20) years of professional work experience and held a number of senior executive-level positions. (Doc. No. 27, p. 3, ¶8; Doc. No. 36, p. 2, ¶8).

At the outset of her employment, Bradford signed a "Receipt for Employee Handbook," where she acknowledged receipt of TMA's current Employee Handbook and agreed to read the

Handbook thoroughly. (Doc. No. 27, p. 4, ¶9; Doc. No. 36, p. 2, ¶9; Doc. No. 42, p. 2, ¶2). As a TMA executive and senior manager, Bradford was required to comply with the company's employee policies and was also responsible for enforcing the policies. (Doc. No. 27, p. 4, ¶10; Doc. No. 36, p. 2, ¶10). The Employee Handbook contained a detailed Non-Discrimination and Anti-Harassment policy ("The Policy"), which prohibits discriminatory practices, including sexual harassment. (Doc. No. 27, p. 4, ¶11; Doc. No. 36, p. 2, ¶11).[1] The Policy defines harassment, provides examples of prohibited conduct, and details the manner in which employees should report incidents of harassment, discrimination or retaliation. (Doc. No. 27, p. 4, ¶¶11-12; Doc. No. 36, p. 3, ¶¶11-12). The Policy states that TMA "strongly encourages the reporting of all incidents of discrimination, harassment or retaliation, regardless of the offender's identity or position." (Doc. No. 27, p. 5, ¶13; Doc. No. 36, p. 3, ¶13). Retaliation against anyone who reports discrimination or harassment is expressly barred and constitutes a "serious violation" punishable by disciplinary action. (Doc. No. 27, p. 5, ¶14; Doc. No. 36, p. 3, ¶14). The Policy also states:

> **IMPORTANT NOTICE TO ALL EMPLOYEES: Employees who have experienced conduct they believe is contrary to this policy have an obligation to take advantage of this complaint procedure. An employee's failure to fulfill this obligation could affect his or her rights in pursuing legal action.**
>
> Early reporting and intervention have proven to be the most effective method of resolving actual or perceived incidents of harassment. Therefore, while no fixed reporting period has been established, TMA strongly urges the prompt reporting of complaints or concerns so that rapid and constructive action can be taken.

(Doc. No. 27, pp. 4-5, ¶12; Doc. No. 36, p. 3, ¶12) (Emphasis in original).

---

[1] Due to its length (four pages), the Policy is not reproduced here in full, but is instead summarized by the Court. The Policy is attached to TMA's Motion [Doc. No. 27] as Exhibit D and has been fully considered by the Court.

Plaintiff resigned her employment with TMA on Friday, March 30, 2012. (Doc. No. 27, p. 3, ¶3; Doc. No. 36, p. 2, ¶3). During the morning of March 30, 2012, TMA's CEO, John Smith, conducted a meeting with Bradford and JT Young ("Young"), TMA's Chief Technology Officer, to discuss an important, $20-30 million project referred to as "FAA/Ecodomus." (Doc. No. 27, pp. 5-6, ¶¶ 15, 18; Doc. No. 36, p. 3, ¶¶ 15, 18; Doc. No. 42, p. 2, ¶1, fn. 1). Smith testified that he was upset with the handling of the project and was particularly displeased that neither Bradford nor Young had followed-up with the client after TMA sent code information to the client days earlier. (Doc. No. 27, p. 6, ¶¶ 17-18; Doc. No. 36, p. 3, ¶¶ 17-18; Doc. No. 42, p. 2, ¶1, fn. 1). Smith and Bradford both raised their voices during the meeting, but Smith did not scream, curse, threaten, or become belligerent. (Doc. No. 27, p. 6, ¶18; Doc. No. 36, p. 3, ¶18; Doc. No. 42, p. 2, ¶1, fn. 1). Following the meeting, Bradford told Young that she had "never before been treated like that," or words to that effect. (*Id.*). Later in the morning on March 30, 2012, Bradford and Smith attended another meeting with two accountant-auditors, during which Bradford became agitated and raised her voice. (Doc. No. 27, p. 7, ¶20; Doc. No. 36, p. 3, ¶20; Doc. No. 42, p. 2, ¶1, fn. 1). Smith calmly said to Bradford, "I just need you to do your job," and Bradford left the meeting a few minutes later. (*Id.*).

After Smith left the meeting with the accountants, he returned to his office and forwarded Bradford an email regarding the FAA/Ecodomus project. (Doc. No. 27, p. 7, ¶21; Doc. No. 36, p. 4, ¶21; Doc. No. 42, p. 2, ¶1, fn. 1). A series of additional emails followed in which Smith is critical, yet professional, regarding the mishandling of the FAA/Ecodomus project. (Doc. No. 27, p. 7, ¶21; Doc. No. 36, p. 4, ¶21; Doc. No. 42, p. 2, ¶1, fn. 1). Approximately ten minutes after the last email from Smith to Bradford, at around 11:30 a.m. on Friday, March 30, 2012, Bradford walked to Smith's office, told him she was sick of his "bullshit," and then left TMA.

(Doc. No. 27, p. 7, ¶22; Doc. No. 36, p. 4, ¶22; Doc. No. 42, p. 2, ¶1, fn. 1). Observing that Bradford's office light was out and her personal effects were gone, Young contacted Bradford at approximately 1:30 p.m. to ask if she had quit. (Doc. No. 27, p. 8, ¶24; Doc. No. 36, p. 5, ¶24; Doc. No. 42, p. 2, ¶1, fn. 1). She told Young that she had quit. (*Id.*). Later in the afternoon, around 4:52 p.m., Bradford sent a text message to Smith confirming that she resigned. (Doc. No. 27, p. 8, ¶26; Doc. No. 36, p. 5, ¶26).

Bradford testified during her deposition that, at the time of her resignation, she did not tell Smith or anyone else at the company what "issues" she had with regard to her employment because they "didn't ask," and she was not going to tell them unless they asked. (Doc. No. 27, pp. 8-9, ¶27; Doc. No. 36, p. 5, ¶27). A few days after her resignation, on April 3, 2012, Bradford exchanged several text messages with Young. Bradford texted: "I didn't leave b[e]c[ause] of me, I left b[e]c[ause] I couldn't tolerate the treatment of all of TMA." (Doc. No. 27, p. 9, ¶28; Doc. No. 36, p. 5, ¶28). Bradford went on to say, in the same text message, that Smith treated Young and other male employees (whom she referred to as "Derek, Darren, Adam, etc") "poorly," and that Smith's treatment of the male employees "upset [her] greatly." (*Id.*). In another text message, Bradford stated to Young: "I am not angry at John [Smith] at all, he is who he is and i could choose to stay and accept it or exercise my right to pursue an environment better suited for me and my value system." (Doc. No. 27, p. 9, ¶29; Doc. No. 36, p. 5, ¶29).

On January 24, 2013, nearly ten months after her resignation from TMA, Bradford filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), claiming unlawful sexual discrimination by TMA. (Doc. No. 27, p. 9, ¶30; Doc. No. 36, p. 5, ¶30). On July 23, 2013, Bradford filed her Complaint in this case, alleging *inter alia* that Smith made various inappropriate comments to her that were sexual in nature throughout the entire

course of her employment; he occasionally gave her unwelcome hugs and back rubs; at least once he commented about her breasts and buttocks; he asked her to run errands with him outside the office and to his home on two occasions; and he "engaged in loud, angry and abusive outbursts" directed at her.  (Doc. No. 2, pp. 3-4; Doc. No. 27, pp. 9-10, ¶31; Doc. No. 36, p. 5, ¶31).  Bradford claimed that she was constructively discharged from her employment on March 30, 2012, after Smith allegedly spoke about his sex life to Bradford and later engaged in a "loud, angry and abusive outburst." (*Id.*).  TMA disputes that Smith engaged in the conduct alleged.[2]

During her employment, Bradford did not make an official complaint, pursuant to TMA's Policy or otherwise, regarding the alleged discriminatory or harassing behavior.  (Doc. No. 27, p. 10, ¶32; Doc. No. 36, p. 6, ¶32; Doc. No. 42, p. 2, ¶6).  Bradford testified in her deposition that she did not do anything to see that Smith's alleged sexually harassing conduct toward her cease. (Doc. No. 27, p. 11, ¶36; Doc. No. 36, p. 6, ¶36; Doc. No. 42, p. 2, ¶6).  More specifically, Bradford testified as follows:

|  |  |
| --- | --- |
| **Question [Ms. Jeter]:** | My question is whether you personally did anything to see that the conduct directed to you ceased? |
| **Answer [Ms. Bradford]:** | <u>No, I did not</u>. |

(*Id.*).  Bradford did not ask Mary Tolbert, the Director of Administration who oversaw Human Resources, or any of the other executives or managers at TMA to investigate or to take preventative, corrective or remedial measures in connection with the alleged conduct. (Doc. No. 27, p. 10, ¶33; Doc. No. 36, p. 6, ¶33; Doc. No. 42, p. 3, ¶7).  Bradford did not report the alleged conduct to TMA's corporate counsel, Paul Kingsolver, or ask that he take any action.  (Doc. No. 27, p. 10, ¶34; Doc. No. 36, p. 6, ¶34).  Bradford testified that she never considered making an

---

[2] This factual dispute is not material with respect to the Court's determination of the legal issues presented in TMA's Motion.

anonymous complaint, contacting the EEOC, or contacting an attorney in connection with the alleged behavior.  (Doc. No. 27, p. 10, ¶35; Doc. No. 36, p. 6, ¶35).

There are no documents evidencing or discussing the alleged sexual comments and conduct toward Bradford, and Bradford did not herself memorialize it.  (Doc. No. 27, p. 11, ¶38; Doc. No. 36, p. 7, ¶38).  No documents exist showing that Bradford communicated with any other person about the alleged sexual comments and conduct by Smith.  (Doc. No. 42, p. 3, ¶9). No witnesses exist to the sexual comments that Bradford asserts Smith made "almost daily" in her office.  (Doc. No. 27, p. 11, ¶40; Doc. No. 36, p. 7, ¶40). Young testified that he and Bradford were close, that they discussed personal matters from time to time, and that Bradford would confide in him.  (Doc. No. 27, p. 11, ¶41; Doc. No. 36, p. 8, ¶41).  Bradford never told Young that Smith engaged in behavior that was inappropriate, offensive or abusive. (*Id.*). Similarly, Young never heard such comments or observed such behavior in the workplace by Smith.  (*Id.*).  Young, who has been employed by TMA since 1992, also testified that in his experience and observations Smith treated male and female employees the same.  (Doc. No. 27, p. 12, ¶42; Doc. No. 36, p. 8, ¶42).

Bradford's work performance was not affected by the alleged conduct by Smith, as Bradford testified that she always performed her job duties better than satisfactory.  (Doc. No. 27, p. 3, ¶7; Doc. No. 36, p. 2, ¶7).  Further, during the time that Bradford claims to have been subjected to sexual harassment by Smith, she and Smith maintained a cordial, professional relationship. (Doc. No. 27, p. 12, ¶44; Doc. No. 36, pp. 8-9, ¶44).  Bradford admits that she engaged in emails and/or text messages with Smith that were good-natured or light-hearted in nature. (*Id.*). In one text message, Bradford stated to Smith, "Sending you hugs and kisses :)," and in another text message, Bradford told Smith "xoxo."  (*Id.*; Doc. No. 27, Exh. M).  Bradford

sent Smith a text message on May 3, 3012, more than four weeks after her resignation, stating: "So glad to here [sic] UC went well, congrats." (Doc. No. 27, p. 13, ¶45; Doc. No. 36, p. 9, ¶45; Doc. No. 27, Exh. J).

Throughout Smith's more than 15-year career with TMA, only one employee, Beth Weber, has made a complaint during their employment against Smith. (Doc. No. 27, p. 13, ¶46; Doc. No. 36, p. 9, ¶46). Bradford, two other senior managers, and TMA's legal counsel were responsible for handling the complaint. (Doc. No. 27, p. 14, ¶47; Doc. No. 36, p. 9, ¶47; Doc. No. 42, p. 4, ¶12). Bradford acknowledged during her deposition that the complaint was taken seriously. (*Id.*). Pursuant to the Policy, TMA formally acknowledged receipt of the complaint on the same day; investigated the complaint the next business day; and issued a written, remedial action plan the day following the investigation. (*Id.*). Weber was satisfied with the action taken by TMA and made no further complaints. (Doc. No. 27, p. 14, ¶48; Doc. No. 36, p. 9, ¶48).

## II. <u>STANDARD OF REVIEW</u>

Summary judgment pursuant to Fed. R. Civ. P. 56 is appropriate where no genuine issue of material fact exists, and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Kendall v. Watkins*, 998 F.2d 848, 850 (10th Cir. 1993). The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex*, 477 U.S. at 317. "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole,

which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Id.* at 327.

"When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (citations omitted). "The mere existence of a scintilla of evidence is support of the plaintiff's position will be insufficient; there must be evidence on which the (trier of fact) could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. In essence, the inquiry for the Court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 250.

### III.    TITLE VII SEXUAL HARASSMENT

Title VII of the Civil Rights Act of 1964 makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). "[T]he very fact that the discriminatory conduct was so severe or pervasive that it created a work environment abusive to employees because of their race, gender, religion, or national origin offends Title VII's broad rule of workplace equality." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 22 (1993). "[A] violation of Title VII may be predicated on either of two types of sexual harassment—(1) harassment that involves the conditioning of employment benefits on sexual favors, and (2) harassment that, while not affecting economic benefits, creates a hostile or

offensive working environment." *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57 (1986). In this case, Bradford alleges the latter.

To constitute actionable hostile work environment claim for sexual harassment, Bradford must show that "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Herrera v. Lufkin Indus., Inc.,* 474 F.3d 675, 680 (10th Cir. 2007) (quotation omitted). "But severity and pervasiveness are not enough. The plaintiff must produce evidence that she was the object of harassment *because of her gender.*" *Chavez v. New Mexico,* 397 F.3d 826, 833 (10th Cir. 2005) (emphasis in original, quotation omitted). "If the nature of an employee's environment, however unpleasant, is not due to her gender, she has not been the victim of sex discrimination as a result of that environment." *Stahl v. Sun Microsystems, Inc.,* 19 F.3d 533, 538 (10th Cir. 1994).

## IV.   ANALYSIS

### A.  Timeliness of Charge of Discrimination

In order to bring a Title VII claim, a plaintiff must file an official Charge of Discrimination with the EEOC within 300 days of the discrete discriminatory act, or lose the ability to recover for it in a court of law. 42 U.S.C. § 2000e–5(e)(1); *Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 113 (2002). "The very precision of this requirement… bespeaks Congress's concern. Title VII is not intended to allow employees to dredge up old grievances; they must promptly report and take action on discriminatory acts when they occur." *Duncan v. Manager, Dep't of Safety, City & Cnty. of Denver*, 397 F.3d 1300, 1308 (10th Cir. 2005). The 300-day time period is subject to equitable doctrines such as tolling or estoppel, although they are used sparingly. *Id.*; *see also Baldwin Cnty. Welcome Center v. Brown,* 466 U.S. 147, 152

(1984) ("Procedural requirements established by Congress for gaining access to the federal courts are not to be disregarded by courts out of a vague sympathy for particular litigants"). Exhaustion of administrative remedies is a jurisdictional prerequisite to filing a Title VII action. *See Jones v. United Parcel Serv., Inc.,* 502 F.3d 1176, 1183 (10th Cir. 2007).

The limitation period may be problematic for hostile work environment claims because "[s]uch claims do not consist primarily of discrete acts, but often involve a series of incidents that span a period longer than 300 days." *Id.* However, the United States Supreme Court has concluded that "as long as 'an act' contributing to a hostile work environment **took place no more than 300 days before the plaintiff filed an EEOC charge**, a court may consider the complete history of acts comprising that hostile work environment." *Id. citing Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 117 (2002). Here, the last alleged discriminatory act occurred on the date of Bradford's resignation, March 30, 2012. Bradford filed her Charge on January 24, 2013, which is 301 days after she resigned from TMA on March 30, 2012.

Bradford failed to file her Charge within 300 days of the last allegedly discriminatory act. She has not argued, nor presented any evidence in support of an argument, that the statutorily mandated 300-day limitation period should be tolled, even by one day. Accordingly, Bradford's Title VII claims are barred and summary judgment must be entered in favor of TMA.

## B. Gender-based Discrimination

Bradford "must produce evidence that she was the object of harassment *because of her gender.*" *Chavez,* 397 F.3d at 833 (emphasis in original). "If the nature of an employee's environment, however unpleasant, is not due to her gender, she has not been the victim of sex discrimination…." *Stahl,* 19 F.3d at 538. Further, "where the conduct complained of is equally offensive to male and female workers" there is no remedy under Title VII. *Henson v. City of*

*Dundee,* 682 F.2d 897, 904 (11th Cir. 1982). "In such cases, the sexual harassment would not be based upon sex because men and women are accorded like treatment." *Id.* In *Williams v. Woodhull Med.l and Mental Health Ctr.*, 891 F. Supp. 2d 301 (E.D. N.Y. 2012), the Court determined that the plaintiff, a female physician, failed to make a prima facie showing of hostile work environment discrimination under Title VII because there was an absence of evidence demonstrating that the department chief's conduct was based on plaintiff's membership in a protected class, such as her sex.

There is no evidence here that the alleged harassment or hostile work environment was directed at Bradford because of her gender, and Bradford's own admissions undermine her contention that there could be an inference of sex-based discrimination. Just days after her resignation from TMA, Bradford sent a text message to another TMA manager, Young, stating that she did not resign because of the treatment directed at <u>her</u>, rather she left because of the "treatment of <u>all of TMA</u>." (Doc. No. 27, Exh. K, emphasis added). Bradford referred specifically to Smith's poor treatment of male employees – Young, "Derek, Darren, Adam, etc." – and how this "upset [her] greatly." (*Id.*). Further, Young, a male, was subjected to the same behavior by Smith during the meeting preceding Bradford's resignation on March 30, 2012. (Doc. No. 27, p. 6, ¶18; Doc. No. 36, p. 3, ¶18; Doc. No. 42, p. 2, ¶1, fn. 1). Young testified that Smith was "firm" during the meeting, and that he elevated his voice but did not yell, curse or become belligerent. (*Id.*). Young further testified that Smith never singled out Bradford or any other female employee and in fact treated both female and male employees the same. (Doc. No. 27, p. 12, ¶42; Doc. No. 36, p. 8, ¶42). Bradford was even paid more than *all male employees* except for Smith. (Doc. No. 27, p. 3, ¶4; Doc. No. 36, p. 2, ¶4).

There is no evidence that the conduct alleged by Bradford was directed at her because of her sex. Accordingly, summary judgment is entered in favor of TMA.

## C. Constructive Discharge

"[U]nless conditions are beyond 'ordinary' discrimination, a complaining employee is expected to remain on the job while seeking redress." *Perry v. Harris Chernin, Inc.,* 126 F.3d 1010, 1015 (7th Cir. 1997). An "employee who wishes to establish that a resignation in effect constitutes a constructive discharge for purposes of a Title VII claim must show that the 'employer [has] deliberately ma[d]e or allow[ed] the employee's working conditions to become so intolerable that the employee has **no other choice but to quit**.'" *Vann v. Sw. Bell Tel. Co.,* 179 F. App'x 491, 498 (10th Cir. 2006), quoting *MacKenzie v. City & County of Denver,* 414 F.3d 1266, 1281 (10th Cir. 2005) (emphasis added).

"The question is not whether the employee's resignation resulted from the employer's actions, but whether the employee had any other reasonable choice but to resign in light of those actions." *Tran v. Trs. of the State Colls. in Colo.,* 355 F.3d 1263, 1270 (10th Cir. 2004). "The bar is quite high in [constructive discharge] cases: a plaintiff must show he had no other choice but to quit." *Garrett v. Hewlett-Packard Co.,* 305 F.3d 1210, 1221 (10th Cir. 2002) (citation and quotation omitted)*; see also Pa. State Police v. Suders*, 542 U.S. 129, 142 (2004) (Constructive discharge occurs when an employer creates working conditions so intolerable that the employee has no option but to resign)*; Sandoval v. City of Boulder, Colo.*, 388 F.3d 1312, 1325 (10th Cir. 2004) (same); *Bolden v. PRC, Inc.,* 43 F.3d 545, 552 (10th Cir. 1994) (Plaintiff is required to show that she was "forced to quit due to [gender]-based intolerable working conditions.").

"The plaintiff's burden in a constructive discharge case is substantial" and "requires a showing that the working conditions imposed by the employer are not only tangible or adverse,

but intolerable.'" *E.E.O.C. v. PVNF, L.L.C.,* 487 F.3d 790, 805 (10th Cir. 2007) (quotation omitted). The standard for establishing constructive discharge is higher than the standard for establishing a hostile work environment. *See Fincher v. Depository Trust and Clearing Corp.,* 604 F.3d 712 (2d Cir. 2010). To meet her burden for constructive discharge, Bradford must show "something more than pervasive sexual harassment." *Newland v. Stevinson Toyota East, Inc.,* 505 F.Supp.2d 689, 699 (D. Colo. 2007) (emphasis added) (citation omitted).

In evaluating the constructive discharge claim, "we apply an objective test under which neither the employee's subjective views of the situation, nor her employer's subjective intent . . . are relevant." *Tran,* 355 F.3d at 1270. Constructive discharge is evaluated from a reasonable person standard, and the Court "must focus exclusively on the objective evidence in the record." *Rennard v. Woodworker's Supple, Inc.,* 101 Fed. App'x 296, 309 (10th Cir. 2004); *see also Sanchez v. Denver Pub. Schs.,* 164 F.3d 527, 534 (10th Cir. 1998) (noting that "the plaintiff's subjective views of the situation are irrelevant") (citation omitted). Plaintiff "bears the burden of proving she was constructively discharged by a preponderance of credible evidence; mere uncontroverted evidence, if not credible, is insufficient." *Hirschfeld v. N. M. Corrs. Dept.,* 916 F.2d 572, 580 (10th Cir. 1990).

### 1.     No Option but to Resign

Here, Bradford cannot establish that she "had no option but to resign" due to sex-based intolerable working conditions. The record reflects that Bradford knew there were options available to her other than resigning her employment, yet she chose not to avail herself of those alternatives. Bradford testified about her resignation as follows: "If John [Smith] would have texted and said things are going to change… come in, let's talk about it… I'd like to hear what your issues are so we can address them, I would have, you know, probably cooled off Friday,

and Monday gone in there and talked to [the other senior managers] and John [Smith]…." (Doc. No. 27, pp. 8-9, ¶27; Doc. No. 36, p. 5, ¶27). Bradford testified that she did not visit with Smith or the other senior managers about her "issues" at the time of her resignation because they "didn't ask." (*Id.*). Bradford testified that unless she was asked, she was not going to tell them what her issues were. (*Id.*). Days after her resignation, Bradford sent a text message to another employee stating that she "chose" to "exercise [her] right to pursue an environment better suited for [her]…." (Doc. No. 27, p. 9, ¶29; Doc. No. 36, p. 5, ¶29).

Bradford was a top executive and senior manager at TMA making $250,000 per year. (Doc. No. 27, p. 3, ¶¶3-5; Doc. No. 36, p. 2, ¶¶3-5). She knew the company's policies and procedures for reporting harassment in the workplace. (Doc. No. 27, p. 4, ¶¶9-10; Doc. No. 36, p. 2, ¶¶9-10). As CIO and COO of the company, Bradford was responsible for ensuring that other TMA employees followed the policy. (Doc. No. 27, p. 4, ¶10; Doc. No. 36, p. 2, ¶10). In addition, Bradford was aware that a prior complaint against Smith was taken seriously, investigated promptly, and resulted in an effective remedial plan. (Doc. No. 27, p. 14, ¶¶47-48; Doc. No. 36, p. 9, ¶¶47-48). After following the proper reporting process, the employee never experienced any additional problems or made any other complaints. (Doc. No. 27, p. 14, ¶48; Doc. No. 36, p. 9, ¶48). It is also noteworthy that Bradford joined TMA with nearly 20 years of professional work experience, including extensive executive and supervisory experience. (Doc. No. 27, p. 3, ¶8; Doc. No. 36, p. 2, ¶8).

When asked in her deposition whether she did "anything to see that the conduct directed to her ceased," she answered **"No, I did not."** (Doc. No. 42, p. 3, ¶7). Bradford did not make an official complaint of sexual harassment or discrimination pursuant to TMA's written policies, and she did not ask anyone at the company to investigate or to take corrective or preventative

measures.  (Doc. No. 27, p. 10, ¶¶32-34; Doc. No. 36, p. 6, ¶¶32-34).  Bradford did not report the alleged conduct to TMA's legal counsel or ask that he take any action.  (Doc. No. 27, p. 10, ¶34; Doc. No. 36, p. 6, ¶34).  Bradford testified that she never considered making an anonymous complaint, contacting the EEOC, or contacting an attorney in connection with the alleged unlawful behavior.  (Doc. No. 27, p. 10, ¶35; Doc. No. 36, p. 6, ¶35).

While Bradford asserts that she commented to her co-managers that Smith talked about his sex life, her brief comment was made casually during a broader conversation, and she did not ask that any action be taken.  There is no evidence that Bradford's passing comment was made in a manner that suggested she was upset or personally offended or that Smith's alleged "sex talk" was anything more than "run-of-the-mill boorish, juvenile, or annoying behavior that is not uncommon in American workplaces," which "is not the stuff of a Title VII hostile work environment claim."  *Morris*, 666 F.3d at 664 (10th Cir. 2012).  Further, while Bradford alleges that, months before she resigned, she talked to Smith about "aggressive and inappropriate" behavior, and the same day Smith sent her a text stating that he had been a "jerk," she testified that she "never once during [her] employment asked Mr. Smith not to talk to [her] about sex." (Doc. No. 27-2, p. 67).  She testified that "inappropriate" behavior could be something very different than "sex talk." (*Id.*).  She also testified that she did not take any action during her employment to see that the alleged sexual harassment would cease.  (Doc. No. 42, p. 3, ¶7).

In *Smith v. Akstein,* 408 F.Supp.2d 1309 (N.D. Ga. 2005), the plaintiff brought suit under Title VII for sexual discrimination and constructive discharge against her employer Akstein Eye Center. The alleged harasser was Dr. Akstein, plaintiff's supervisor and President and CEO of the Eye Center. *Smith,* 408 F.Supp.2d at 1329. The Eye Center maintained an employee handbook with an anti-discrimination policy, and the plaintiff signed a statement acknowledging

receipt of the handbook and policy. *Id.* at 1316-1317. The plaintiff admitted that she never made any official report pursuant to the valid anti-harassment policy. *Id.* at 1317. The court found the plaintiff was not constructively discharged. *Id.* at 1331, citing *Kilgore v. Thompson & Brock Mgmt., Inc.,* 93 F.3d 752, 754 (11th Cir. 1996). The court concluded that the plaintiff left her employment prior to making any formal complaint and therefore she "did not allow any opportunity to gauge whether Dr. Akstein's conduct toward her would have improved following her internal complaint of sexual harassment." *Smith,* 408 F. Supp. 2d at 1332.

Based on the undisputed facts, the Court finds that Bradford had other reasonable options available to her besides resignation. She chose to resign rather than pursue those opportunities. As a result, Bradford cannot meet the burden necessary for establishing constructive discharge, and summary judgment is hereby entered in favor of TMA.

2.    Intolerable Working Conditions

Bradford's decision not to pursue options available to her besides resignation also establishes, both objectively and subjectively, that the alleged sexual harassment did not rise to the level of "intolerable" working conditions for purposes of constructive discharge. Bradford alleges that she was subjected to the same kind of sexual harassment from the first day of her employment until the last day of her employment (two years and three months), yet she made no report of the alleged conduct, she did not ask any other manager to take corrective or preventative action, and she testified that she did not take steps to see that the conduct ceased. (Doc. No. 27, pp. 10-11, ¶¶32-37; Doc. No. 36, pp. 6-7, ¶¶32-37; Doc. No. 42, pp. 2-3, ¶¶6-8). In addition, the alleged conduct did not affect Bradford's ability to perform her job, as she testified that she performed her job in a more than satisfactory manner *at all times* during her employment with TMA. (Doc. No. 27, p. 3, ¶7; Doc. No. 36, p. 2, ¶7). Finally, the undisputed

facts show that during the time that Bradford claims she was subjected to sexual harassment, she maintained a cordial relationship with Smith and sent him text messages and emails that were good-natured, light-hearted, joking and even caring in nature. (Doc. No. 27, p. 12, ¶44; Doc. No. 36, pp. 8-9, ¶44). For example, in one text message sent to Smith, Bradford states "Sending you hugs and kisses :)" and in another text message, Bradford states "xoxo." (*Id.*).

Based on the undisputed facts, Bradford's working conditions cannot be considered intolerable for purposes of constructive discharge. *See Gawley v. Ind. Univ.*, 276 F.3d 301, 315 (7th Cir. 2001) (plaintiff's conduct in not formally complaining and remaining on the job for two months after the alleged harassment indicated that her working conditions were not intolerable). A showing of severe and pervasive sexual harassment is not enough to establish intolerable working conditions for purposes of constructive discharge. *See PVNF,* 487 F.3d at 805-06; *Newland*, 505 F.Supp.2d at 699. Applying a reasonable person standard, and focusing "exclusively on the objective evidence in the record," Bradford cannot satisfy her "substantial" burden of constructive discharge. *See PVNF,* 487 F.3d at 805-06; *Rennard*, 101 Fed. App'x at 309. There was no constructive discharge, and summary judgment is entered in favor of TMA.

### D. *Faragher/Ellerth* Affirmative Defense

While some Courts of Appeals from other Circuits have held that the *Faragher/Ellerth* affirmative defense is unavailable when the supervisor in question is the employer's proxy or alter ego (such as the company's CEO), the Tenth Circuit has "not squarely addressed whether an employer may rely on the *Faragher/Ellerth* defense when a victimized employee seeks to impose liability on the employer under the alter-ego theory." *Helm v. Kansas*, 656 F.3d 1277, 1286 (10th Cir. 2011). The Court explained in *Helm* that "[t]he contours of the alter-ego theory are not well defined." *Id.* Bradford does not dispute application of the *Faragher/Ellerth* defense

here, but instead argues that TMA lacks evidentiary support to satisfy the defense. This Court finds that the *Faragher/Ellerth* defense applies. The Court further notes that there are established policies and procedures within TMA that are available to employees who feel they have been subjected to sexual harassment, and which, if properly implemented and followed, would be effective against even a high-ranking official, such as the CEO.

Under the *Faragher/Ellerth* defense, where no tangible, adverse employment action has been taken against the employee, the employer will not be liable for actionable hostile work environment if it proves by a preponderance of the evidence that: (1) it 'exercised reasonable care to prevent and correct promptly any sexually harassing behavior,' and (2) the plaintiff 'unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.'" *Pinkerton v. Colo. Dep't of Transp.,* 563 F.3d 1052, 1058-1059 (10th Cir. 2009), citing *Burlington Indus., Inc., v. Ellerth,* 524 U.S. 742, 765 (1998); *see Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998). The *Faragher/Ellerth* affirmative defense accommodates the "avoidable consequences doctrine," under which victims have a duty to use such means as are reasonable under the circumstances to avoid or minimize harm. *Suders,* 524 U.S. at 146 (citations omitted). The "primary objective" of Title VII "is not to provide redress but to avoid harm." *Faragher,* 524 U.S. at 806.

"[T]he existence of a valid sexual harassment policy is an important consideration in determining whether an employer acted reasonably to prevent sexual harassment." *Helm v. Kansas*, 656 F.3d 1277, 1288 (10th Cir. 2011). In *Helm*, the employer "implemented a sexual harassment policy that prohibits sexual harassment, contains a complaint procedure and list of personnel to whom harassment may be reported, and includes an anti-retaliation provision." *Id.* at 1288. TMA's policy contained similar provisions. (Doc. No. 27, Exh. D, TMA 407-410).

Further, the employer in *Helm*, just like TMA, distributed the sexual harassment policies to employees via an employee handbook and required employees to sign a form affirming receipt and acknowledge it was their responsibility to read and understand the policies. *Helm* at 1289. In *Helm*, the plaintiff claimed to be unaware of the policy, however the court found that "even if [the plaintiff] did not have actual knowledge of the policy, she had constructive knowledge." *Id.* Here, Bradford admits she signed a form acknowledging receipt and review of the Handbook, she knew of the Policy at issue, and she admits she was charged with enforcing the Policy. (Doc. No. 27, p. 4, ¶¶9-10; Doc. No. 36, p. 2, ¶¶9-10; Doc. No. 42, p. 2, ¶2).

In addition, the undisputed facts show that Bradford failed to follow the known procedures at TMA, and "a demonstration of such failure will normally suffice to satisfy the employer's burden under the second element of the defense." *Ellerth,* 524 U.S. at 765. Despite Bradford's actual knowledge of the Policy, she has provided no reason for why she failed to avail herself of it. Bradford admitted that she never requested that any of the management-level employees take any action concerning the alleged conduct of Smith. (Doc. No. 27-2, pp. 67-68).

It is undisputed that: (1) Bradford never suffered any adverse employment action (Doc. No. 27, p. 3, ¶¶ 6-7; Doc. No. 36, p. 2, ¶¶ 6-7); (2) TMA maintained an effective anti-harassment policy (Doc. No. 27, Exh. D, TMA 407-410); and (3) Bradford unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to otherwise avoid harm (Doc. No. 27, p. 8, ¶27, pp. 10-11, ¶¶ 32-37; Doc. No. 36, p. 5, ¶27, pp. 6-7, ¶¶ 32-37; Doc. No. 42, p. 2, ¶¶ 4 and 6, p. 3, ¶¶ 7-8). The *Ellerth/Faragher* defense requires entry of summary judgment in favor of TMA. *See Ellerth,* 524 U.S. at 765; *Debord v. Marcy Health System of Kansas, Inc.,* 737 F.3d 642 (10th Cir. 2013) (the prevention component of *Faragher* defense does not require more than an adequate policy to prevent harm); *Shaw v. Autozone, Inc.,*

180 F.3d 806, 813 (7th Cir. 1999) ("As we have often said, the law against sexual harassment is not self-enforcing and an employer cannot be expected to correct harassment unless the employee makes a concerted effort to inform the employer that a problem exists."); *Helm*, 656 F.3d at 1291-1292 (an unreasonable delay in plaintiff's reporting can satisfy the second prong of the affirmative defense); *Kramer v. Wasatch Cnty. Sheriff's Office*, 743 F.3d 726, 757 (10th Cir. 2014) ("To impute constructive notice to the employer, the level of pervasiveness must exceed that required to make out a prima facie hostile workplace case and the plaintiff must point to specific facts to support such a finding of pervasiveness-plus."); *Barrett v. Applied Radiant Energy Corp.,* 240 F.3d 262, 268 (4th Cir. 2001) (generalized fear of retaliation is not a valid defense for not making a report).

### E.  Severe and Pervasive Sexual Harassment

Given the forgoing rulings, the Court need not decide whether the evidence establishes a sufficiently severe and pervasive work environment necessary for Bradford's Title VII sexual harassment hostile work environment claim. However, considering the totality of the circumstances presented, the undisputed facts do not establish that Bradford experienced sexual harassment that was so severe and pervasive as to alter the conditions of her employment. Again, Bradford did not report the alleged sexual harassment and did not take steps to prevent or remedy the alleged harassment. (Doc. No. 27, p. 8, ¶27, pp. 10-11, ¶¶ 32-37; Doc. No. 36, p. 5, ¶27, pp. 6-7, ¶¶ 32-37; Doc. No. 42, p. 2, ¶¶ 4 and 6, p. 3, ¶¶ 7-8).  Bradford's job performance was not affected by the alleged conduct, as she maintains that she performed her duties better than satisfactory at all times during her employment. (Doc. No. 27, p. 3, ¶7; Doc. No. 36, p. 2, ¶7).  Further, during the time of the alleged harassment, Bradford maintained a friendly relationship with Smith that included numerous text messages and emails sent by Bradford that

were good-natured or playful. (Doc. No. 27, p. 12, ¶44; Doc. No. 36, pp. 8-9, ¶44).  The evidence simply does not establish a sufficiently severe and pervasive work environment necessary for Bradford's Title VII sexual harassment hostile work environment claim.  *See, e.g., Herrera,* 474 F.3d at 680.

## V.     CONCLUSION

The Court finds that Bradford has failed to establish a genuine issue of material fact with respect to the legal issues presented, and TMA is entitled to summary judgment as a matter of law on Bradford's Title VII claims.  Accordingly, TMA's Motion for Summary Judgment [Doc. No. 27] is hereby **granted.**

**IT IS SO ORDERED** this 25th day of  August, 2014.

_____
James H. Payne
United States District Judge
Northern District of Oklahoma